**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| HANOVER AMERICAN INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 2:16-cv-2817-JPM-tmp |
| TATTOOED MILLIONAIRE ENTERTAINMENT, INC.; CHRISTOPHER C. BROWN; DANIEL R. MOTT; and JOHN FALLS, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**ORDER GRANTING PRELIMINARY INJUNCTION
AGAINST DEFENDANT BROWN**

Before the Court is Plaintiff Hanover American Insurance Company ("Hanover")'s Application for Temporary Restraining Order, Preliminary Injunction and Constructive Trust, filed November 14, 2016.  (ECF No. 29.)  On November 22, 2016, the Court in part denied the Temporary Restraining Order.  (ECF No. 41.)  Following limited discovery and further briefing by the parties, on December 7, 2016, the Court entered an Order Concerning Assets of Defendant Christopher C. Brown Prior to Preliminary Injunction Determination, ordering that Defendant Brown's $1.2 million home not be encumbered or sold until the Court rules on Hanover's Application for Preliminary Injunction.  (ECF No. 58.)

The Court held a Preliminary Injunction Hearing on January 6, 2017.  (Min. Entry, ECF No. 74.)  At the hearing, Hanover requested that the Court extend its Order (ECF No. 58) and order that Brown's home not be encumbered or sold until all proceedings in the instant

1

case are concluded.  For the reasons stated below, the Court GRANTS Hanover's Motion for Preliminary Injunction, and ORDERS that Defendant Brown refrain from selling or otherwise encumbering his $1.2 million home until resolution of this case or with leave of the Court. Hanover shall post a $400,000.00 security bond.

## I.  BACKGROUND

Hanover's Complaint, which was filed on October 14, 2016, alleges that Defendants Tattooed Millionaire Entertainment LLC, and its owner Christopher C. Brown, along with Defendants Daniel C. Mott and John Falls, committed insurance fraud in connection with a November 5, 2015 fire that damaged a recording studio and its contends in Memphis, TN. (See generally ECF No. 1.)

### A.  Factual Background

Defendant Christopher Caleb Brown formed Defendant Tattooed Millionaire Entertainment LLC ("TME"), a music production company, in 2014, as the sole owner and member.  (ECF No. 1 ¶ V; see also ECF 68 at PageID 1834.)  Also in 2014, TME purchased a building in Memphis, TN ("insured premises").  (Id.)   The insured premises included three studios, two of which were leased to Defendants Falls and Mott.  (ECF No. 1 ¶ VII.)

On February 5, 2015, TME submitted a Commercial Insurance Application to Hanover.  (Id. ¶ X; ECF No. 68 at PageID 1835.)  The application requested Building Coverage, Business Personal Property, and Business Income, for coverage in total amount of $10.75 million. (Id.)  Hanover issued the policy for the period February 6, 2015 to February 6, 2016.  (ECF No. 1 ¶ XI; see also ECF No. 68 at PageID 1835.)

Before securing this insurance, Brown asserts that he purchased millions of dollars' worth of studio equipment and gear. (ECF No. 61-1 at PageID 998: 12-25.) According to Brown, Michael Sargenti is one seller Brown used "over the last few years" to make these purchases. (Id. at PageID 990:11-15.) Brown and Sargenti made contact "through a website called Gearslutz." (Id. at PageID 1002:5-9.) Despite their years of transactions, Brown testified that he does not have Sargenti's phone number, e-mail address, and has never seen Sargenti in-person or otherwise. (Id. at PageIDs 990:24-25, 1007:9-18, 1034:19-23.) According to Brown, he bought hundreds of pieces of equipment from Sargenti. (see id. at PageIDs 992:5-17, 1003:4-15.) Brown asserts that deliveries from Sargenti were made to various locations (id. at PageID 996:13-16), and that Brown made arrangements for these deliveries through his burner phone(s) (id. at PageIDs 1035:19-25, 1036:1-11). Additionally, Brown testifed that each purchase was made in cash without a receipt or other record, over an unspecified period of time and on unknown dates. (Id. at PageIDs 993:2-20, 1005:23-25, 1006:9-21, 1036:14-18, 1039:9-21, 1006:1-8.) Brown further testified that he always carried large quantities of cash on him (id. at PageID 1006:18), allowing him to pay for each "60, 80, 100,000" purchase in cash (id. at PageID 1039:12-15).

On November 5, 2015, an arson fire occurred at the insured premises, causing substantial damage to the building and studio property therein (e.g., equipment). (ECF No. 1 ¶ XVII.) In addition to the fire, Defendants allege that local gang members started the fire and stole equipment. (Id. ¶ XX.)

On November 10, 2015, Coastal Technical Services ("CTS") was hired by Hanover to inspect the fire damaged studio and studio equipment that was there. (ECF No. 61-16 at PageIDs 1340-41.) TME "also engaged CTS to perform moving, packing and storage of the

remaining [equipment] . . . [,which] included shipping some of the equipment . . . to Orlando, Florida." (Id. at PageID 1341.) CTS categorized the remaining equipment as either repairable, not worth repairing, or undamaged. (Id. at PageIDs 1341-42.) In total, CTS recorded approximately 260 pieces of equipment. (ECF No. 61-16 at PageIDs 1341-42, 1354-61.)

Following the fire, Brown understood that he would need to substantiate any claims of loss to Hanover with documentation. (ECF No. 61-1 at PageIDs 1017:15-25, 1018:1-7.) Brown then contacted Sargenti, telling "[Sargenti] to give [him] a copy of gear that [he] had purchased from [Sargenti]" over the years. (id. at PageID 1002:21-22.) In response, Sargenti gave Brown falsified sales invoices from New York Liquidation (id. at PageID 1011:6-17), Canada Liquidation Sales (id. at PageIDs 999:9-25, 1000:1-5), and the State of Oregon (id. at PageIDs 991:8-17, 992:1-11), as well as Visa and Bank of America transaction statements (id. at PageIDs 999:14-25, 1000:1-2, 1015:3-10). Despite admitting the falsity of the documents, Brown claims that the documents accurately reflect every item that he owned and that was present in the insured premises at the time of the November 2015 fire. (Id. at PageID 1003:4-8.) In total, the falsified documents reflect 764 pieces of equipment. (See ECF Nos. 1-6 – 1-8.)

After Sargenti sent these documents by postal mail, Brown gave the falsified documents to his public adjuster, Keith Hayman, who tendered them to Hanover for a claim of loss. (ECF No. 61-1 at PageIDs 1015:14-25; 1037:1-19.) Hayman provided these documents to Hanover in December 2015. (Id. at PageID 1016; ECF No. 72-1 at PageID 2318 ("On December 31, 2015, [Hanover's Executive General Adjuster Gary A. Barkman] received initial sworn proofs of loss under oath by each of the defendants dated December 30, 2015.");

ECF No. 61-13 at PageIDs 1303-04 (Keith Hayman, on behalf of defendants, emailed Gary Barkman on December 14, 2015 stating, "Enclosed please find invoices for some original studio purchases. Some of these may have been previously provided. . . . Insured has provided ample documentation, information, statements, executed consent forms, etc…to facilitate the initial partial payments. Information will continue to be provided, as requested.")

Hanover's adjuster Barkman then "made initial advance payments to the defendants on February 24, 2016." (ECF No. 72-1 at PageID 2318.) Hanover specifically paid Defendants Brown and TME $1,208,898.49 for building coverage and $1,096,265.68 for business personal property coverage. (ECF No. 1 at PageID 12.)

Thereafter, it came to Hanover's attention that the documents it received were falsified, leading Hanover to file the current cause of action to recover benefit payments paid and to void the policy.

### B.      Procedural Background

On October 14, 2016, Hanover filed its Complaint. (Id.) On November 14, 2016, Hanover filed its Application for Temporary Restraining Order ("TRO"), Preliminary Injunction and Constructive Trust, seeking to require Defendants to place the remaining insurance proceeds into a constructive trust until the final resolution of this cause of action. (ECF No. 29.) On November 21, 2016, Defendants filed responses in opposition to Hanover's TRO request. (ECF Nos. 36-37.)

A TRO hearing was held on November 22, 2016. (Min Entry, ECF No. 39.) The Court denied the TRO in part for lack of adequate factual development. (ECF No. 41.)

Accordingly, the Court permitted the parties to conduct limited discovery before deciding the issue of a preliminary injunction. (Id.) On November 28, 2016, the parties submitted Motions for Limited Discovery. (ECF Nos. 42, 44, 46.) The Court granted some of the requests on November 30, 2016. (ECF No. 47.) Also on November 28, 2016, Defendants filed Motions to Dismiss for Failure to State a Claim. (ECF Nos. 43, 45.)

On December 7, 2016, the Court held an in-person Scheduling Conference. (Min. Entry, ECF No. 54.) At the conference, the Court granted Hanover leave to amend its complaint to (1) add the public adjusting firm as a party, and (2) clarify its claims against Defendants Mott and Falls, and if it did so, the Court noted that the Motions to Dismiss for Failure to State a Claim would be rendered moot. (ECF No. 57.) Also on December 7, 2016, the Court entered an Order Concerning Assets of Defendant Christopher C. Brown Prior to Preliminary Injunction Determination, ordering that Brown's $1.2 million home not be encumbered in any way or sold until the Court has ruled on Hanover's Application for Preliminary Injunction. (ECF No. 58.)

On December 19, 2016, Hanover filed its Amended Complaint. (ECF No. 60.) On December 22, 2016, Hanover filed its Memorandum in Support of its TRO and Preliminary Injunction application. (ECF No. 61.) Defendants filed responses in opposition on December 30, 2016. (ECF Nos. 64-65.) On December 30, 2016, Hanover also responded to Defendants' Motions to Dismiss for Failure to State a Claim. (ECF Nos. 62-63.)

On January 3, 2017, Defendants filed their answers to Hanover's Amended Complaint. (ECF Nos. 68-69.) Defendants Falls and Mott also filed counterclaims against Hanover. (ECF No. 70.) So did TME. (ECF No. 68.)

On January 5, 2017, Defendants Falls and Mott filed forty-one affidavits by witnesses purporting to have seen equipment inside the recording studio at issue at various time prior to the 2015 fire. (ECF No. 71.) That same day, Hanover filed several affidavits in further support of its Motion for Preliminary Injunction. (ECF No. 72.) Hanover also filed a Notice that it was no long seeking injunctive relief against Defendants Mott and Falls. (ECF No. 73.)

A Preliminary Injunction hearing was held on January 6, 2017. (Min. Entry, ECF No. 74.) At the hearing, Hanover amended its request for injunctive relief. Hanover now requests that the Court extend its December 7, 2016 Order, forbidding Defendant Brown from selling or otherwise encumbering his $1.2 million home without first notifying the parties and Court, until the resolution of this case.

## II.   LEGAL STANDARD

### A.   Preliminary Injunction

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). "Accordingly, a party 'is not required to prove his case in full at a preliminary injunction hearing and the findings of fact and conclusions of law made by a court granting the preliminary injunction are not binding at trial on the merits.'" Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007) (quoting Camenisch, 451 U.S. at 395).

Four factors are used to determine whether injunctive relief is appropriate: (1) the likelihood of success on the merits; (2) whether the injunction will save the movant from irreparable injury; (3) whether the injunction would cause substantial harm to others; and (4)

whether the public interest would be served by the injunction. <u>Ohio Democratic Party v.</u>

<u>Donald J. Trump for President, Inc.</u>, No. 16-4268, 2016 WL 6608962, at *1 (6th Cir. Nov. 6,

2016). "These four considerations are factors to be balanced, not prerequisites that must be

met." <u>Tenke Corp.</u>, 511 F.3d at 542 (internal quotation marks omitted) (quoting <u>Camenisch</u>,

451 U.S. at 395). No one factor is dispositive. <u>Capobianco, D.C. v. Summers</u>, 377 F.3d 559,

561 (6th Cir. 2004); <u>see also</u> <u>Mich. Bell Tel. Co. v. Engler</u>, 257 F.3d 587, 592 (6th Cir. 2001).

The burden of persuasion is on the party seeking the injunctive relief. <u>See</u> <u>Stenberg v. Cheker</u>

<u>Oil Co.</u>, 573 F.2d 921, 925 (6th Cir. 1978).

## B. Security Bond Associated with Preliminary Injunction

"The Court may issue a preliminary injunction or a temporary restraining order only if

the movant gives security in an amount that the court considers proper to pay the costs and

damages sustained by any party found to have been wrongfully enjoined or restrained." Fed.

R. Civ. P. 65(c). While the Sixth Circuit has stated a district court "errs when it fails to

expressly consider the question of requiring a bond when the issue has been raised," it has

also found that a court has no mandatory duty to impose a bond as a condition for issuance of

injunctive relief. <u>NACCO Materials Handling Grp., Inc. v. Toyota Materials Handling USA,</u>

<u>Inc.</u>, 246 F. App'x 929, 952 (6th Cir. 2007) (alterations, quotation marks, and citations

omitted). Thus, if the Court finds injunctive relief appropriate, the Court must address

whether a bond is needed, but it need not require one.

## III.    DISCUSSION

### A.    Preliminary Injunction

#### 1.    Likelihood of Success on the Merits

Hanover asserts that there is a high likelihood of its success on the merits because Defendants clearly "acted with intent to deceive" and "to fraudulently induce Hanover to make insurance payments on claims that were fabricated and for losses [that] were not actually incurred."  (ECF No. 61 at PageID 972.)  Hanover contends that "[w]hen an insured lies about the existence, value, or acquisition of property in a claim to an insurer, the insured has made a material, willful misrepresentation with an intent to deceive and the entire policy is voided." (Id. at PageID 963 (citing Smith v. Fireman's Fund Ins. Co., 16 F.3d 1221 (6th Cir. 1994).)  Hanover asserts that Defendant Brown's deposition revealed the following:

> "[N]either [Brown] nor TME filed tax returns in either 2014 or 2015; Brown used almost $1 million of insurance proceeds to make an all cash purchase of a $1.2 million mansion; Brown has apparently squandered all of the $1.2 million paid to TME by Hanover for building repairs on 'touring with his band'; TME has no assets other than the damaged building; there is no money left to repair the building; and Brown could offer no testimony as to the balance of any of his bank or savings accounts or put a value on any of his other property."

(Id. at PageID 961.)  Hanover also highlights the policy language contained in each of the Defendants' policies, which states, in pertinent part:

> This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

> 1. This Coverage Part;
> 2. The Covered Property;
> 3. Your interest in the Covered Property; or
> 4. A claim under this Coverage Part.

(Id. at PageIDs 969-70.)  Under its policy and Tennessee insurance law, Hanover contends that the Defendants' misrepresentations and fraudulent actions void the entire insurance agreement between Hanover and all of the defendants.  (Id. at PageID 970-71 (citing Taylor v. State Farm Ins. Co., 30 F. App'x 570, 571 (6th Cir. 2002).)

Defendants TME and Brown assert that it does not matter whether or not they submitted false documents concerning the purchase of the covered equipment for two reasons.  First, Defendants assert that under Tennessee law, an insurance provider may not sue based on misrepresentations to void a policy for equipment so long as the equipment existed; and here Defendants contend the equipment existed.  (ECF No. 65 at PageID 1681 (citing Baker v. Nationwide, 646 S.W.2d 440, 442 (Tenn. App. 1982).)  Second, Defendants assert that Hanover made its policy payout determinations before receiving the fraudulent documentation.  (Id. at PageIDs 1673, 1686-87 (citing J.C. Wyckoff & Associates, Inc. V. Standard Fire Insurance Company, 936 F.2d 1474, 1496 n.16 (6th Cir. 1991)[1] (interpreting Michigan law).)  TME and Brown also argue that Hanover's claims are fraudulent and fake because Defendants made no misrepresentation in their application for insurance.  (Id. at PageID 1675.)

---

[1] The Court does not find Wyckoff, which applied Michigan state law, persuasive.  Moreover, Defendants' proposition that an insurer cannot claim fraud where it did not rely on the insured's proof of loss when evaluating the claim lacks bases in Tennessee law.  Even so, the evidence here suggests that Hanover received the falsified documents prior to evaluating the Defendants' claims and prior to making its initial partial payments to Defendants.  (See ECF No. 72-1 at PageID 2318 ("On December 31, 2015, [Hanover's Executive General Adjuster Gary A. Barkman] received initial sworn proofs of loss under oath by each of the defendants dated December 30, 2015. . . . I made initial advance payments to defendants on February 24, 2016. . . ."); ECF No. 61-13 at PageIDs 1303-04 (Keith Hayman, on behalf of defendants, emailed Gary Barkman on December 14, 2015 stating, "Enclosed please find invoices for some original studio purchases.  Some of these may have been previously provided. . . .  The Insured has provided ample documentation, information, statements, executed consent forms, etc…to facilitate the initial partial payments.  Information will continue to be provided, as requested.").)

Although lacking the proper nomenclature, the Court construes Hanover's Complaint; Application for Temporary Restraining Order, Preliminary Injunction and Constructive Trust; and Brief in Support as requesting restitution, recovery for payments made due to fraud, and rescission of the insurance policy ("Policy"). The Court therefore addresses Hanover's likelihood of success on the merits on these claims in turn.

### i. Restitution: Recovery of Payments Made Due to Fraud

In Tennessee, insurance companies may sue to recover benefit payments made due to mistake or fraud. Ass'n Life Ins. Co. v. Jenkins, 793 F. Supp. 161, 163 (M.D. Tenn. 1992) (citing Aetna Casualty and Surety Co. v. Parton, 609 S.W.2d 518, 518 (Tenn. Ct. App. 1980) (arson); Tennessee Hospital Service Association v. Strang, 49 Tenn.App. 263, 354 S.W.2d 488, 491 (1962) (physician fraud)). "As a general rule, if an insurer pays a loss as a result of fraud or a mistake as to facts which would have been a sufficient defense in an action by the insured upon the policy, the money so paid may be recovered, especially when it is later determined that the insured violated the policy's fraud and concealment provision." 16 Steven Plitt et al., Couch on Insurance § 225:50 (3rd ed. vol. 2016) (internal footnotes omitted).

In the instant case, Hanover's complaint alleges fraud and misrepresentation as bases for recovery. Although not exactly textually consistent with the applicable law in Tennessee, Hanover's assertions, if proved, could allow recovery, because insurance benefits paid because of fraud are recoverable.

In Tennessee, to succeed in an action for fraudulent misrepresentation, the plaintiff must show: (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4)

the false representation was made either knowingly or without belief in its truth or recklessly; (5) the plaintiff reasonably relied on the misrepresented material fact; and (6) plaintiff suffered damage as a result of the misrepresentation. Erickson v. Erickson-Mitchell, No. M2006-00895-COA-R3CV, 2007 WL 1555824, at *4 (Tenn. Ct. App. May 29, 2007) (citing Metro. Gov't of Nashville and Davidson County, 852 S.W.2d 233, 237 (Tenn. Ct. App. 1992)).

In the instant case, Defendant Brown admitted during his deposition that he knew the documentation he supplied to Hanover prior to Hanover's initial payment was falsified:

> **Q.** Is it -- is it your testimony under oath, sir, that Documents Hanover 16 through Hanover 22, including the Visa receipt in the amount of $800,000, are actual documents of true and accurate financial transactions?
>
> **A.** I was told to get documentation to prove that I owned the gear. I own the gear. I went back to[, Michael Sargenti,] the guy who sold me gear over the last few years, and this is what he gave me.

(ECF No. 61-1 at PageID 990:6-13.)

> **Q**. Okay. And so, in fact, you never had a transaction with the State of Oregon on September 30th, 2013 in the amount of $800,000 to purchase the property 11 reflected on these pages, correct?
>
> **A.** No, sir.
>
> **Q.** I'm sorry.
>
> **A.** No, sir.
>
> **Q.** Okay. Is this - - you're agreeing with my statement, right?
>
> **A.** I did agree with your statement.

(ECF No. 61-1 at PageID 991:8-17.)

> **Q.** Did Michael Sargenti create the fake Visa receipt?
>
> **A.** Yes.

**Q.** And Michael – Michael Sargenti created the fake sales document?

**A.** Yes.

(ECF No. 61-1 at PageIDs 999:25-1000:1-5.)


**Q.** So you sent Mr. Sargenti regular back state - -- bank statements –

**A.** Uh-huh (affirmative response).

**Q.** – and he fal- --he – he falsified it so you could submit it to Hanover; is that right?

**A.** That – that—that wasn't really that way. He said he would need one. I wasn't sure what he was going to do with it, but it looks like that, yes.

**Q.** Okay. So he sent it back to you –

**A.** Uh-huh (affirmative response).

**Q.** – and you – gave it to Hanover, correct?

**A.** I gave it to Keith Hayman.

**Q.** Okay. Keith Hayman was your public adjuster, who was acting on your behalf, in connection with your insurance claim, correct?

**A.** Yes.

**Q.** Okay. And you gave this to Keith Hayman knowing he was going to give it to Hanover, correct?

**A.** Yes.

      . . . .

**Q.** Okay. You – you provided this document to Mr. Hayman who provided it to Hanover as early as December 15th of 2015, correct?

**A.** Yes.

(ECF No. 61-1 at PageIDs 1015:3-21, 1016:5-8.)


Hanover's Executive General Adjuster Gary A. Barkman avers that he "specifically

relied on the [Defendants' initial] sworn proofs of loss [he received on December 31, 2015] as

well as the authenticity of the invoice[s] . . . and [ ] purported Bank of America [wire

13

transfers]. . . . It was represented to [him] by the defendants and their agent that these documents were authentic, true documents." (ECF No. 72-1 at PageID 2318.) Barkman goes on to state that "[h]ad [he] known prior to February 24, 2016 that any one of those documents were fake, [he] would not have made any payments whatsoever on the defendants' claims." (Id.) Hanover therefore asserts that it suffered by paying millions of dollars for a claim based on falsified documentation.

In light of the evidence, the Court finds that elements 1, 2, 4, 5, and 6 are satisfied.[2] Remaining element 3—whether the representation concerned a material fact—is disputed by the parties.

In Tennessee, a fact is material if "a reasonable [person] would attach importance to its existence or nonexistence in determining his [or her] choice of action in the transaction in question. . . ." PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp., 387 S.W.3d 525, 550 (Tenn. Ct. App. 2012) (quoting Patel v. Bayliff, 121 S.W.3d 347, 353 (Tenn. Ct. App. 2003)).

Defendants contend that the admittedly falsified documents were not material to Hanover's decision to tender its initial payment. To support this argument, Defendants explain that although the documents misrepresent where Brown purchased the equipment and the price Brown paid, the documents properly represent what equipment was in the studio at

---

[2] As noted previously, the six elements are:
    (1) the defendant made a representation of an existing or past fact;
    (2) the representation was false when made;
    (3) the representation was in regard to a material fact;
    (4) the false representation was made either knowingly or without belief in its truth or recklessly;
    (5) the plaintiff reasonably relied on the misrepresented material fact; and
    (6) the plaintiff suffered damage as a result of the misrepresentation.
Erickson v. Erickson-Mitchell, No. M2006-00895-COA-R3CV, 2007 WL 1555824, at *4 (Tenn. Ct. App. May 29, 2007).

the time of the fire.  (ECF No. 65 at PageID 1681 (citing <u>Baker v. Nationwide</u>, 646 S.W.2d 440, 442 (Tenn. Ct. App. 1982)).)

Defendants ask the Court to find that the admittedly falsified documents, which were created by an untraceable source, accurately represent the equipment present in Defendants' studio at the time of the fire.  The same untraceable source that created the falsified documents was also the source asserted to have sold the equipment to Defendant Brown for cash.  Accordingly, no other proof of purchase or receipt exists as to these items.  This untraceable story lacks credible indicia of reliability.[3]  Defendants attempt to support the accuracy of the falsified documents by providing the Court with forty-one affidavits of individuals who allegedly visited the studio before the fire and pictures of the studio's interior before the fire, plus the argument that Hanover currently possesses some damaged equipment from the fire.  (<u>See</u> ECF Nos. 36-1, 37-2, 64-1, 65-2, 70-3, 71-1.)  Although this supplemental evidence suggests some equipment was in the studio before the fire, this evidence does not prove that the equipment listed in the falsified documents Hanover received ever actually existed.  Moreover, Hanover's adjuster stated that he relied on the falsified documents to make the initial payments as proof that all the equipment existed prior to the fire.  (ECF No. 72-1 at PageID 2318.)  Had he known the documents were false, he would have rejected the claim.  (<u>Id.</u>)

These facts contrast with those in the chief case Defendants rely on, <u>Baker v. Nationwide Mut. Fire Ins. Co.</u>  646 S.W.2d 440 (Tenn. Ct. App. 1982).  In <u>Baker</u>, the defendant insurer covered plaintiff's personal property from theft.  (<u>Id.</u> at 441.)  When the

---

[3] The Sixth Circuit Court of Appeals has found that similarly "complicated series of untraceable gratuitous transfers" from unavailable sources amount to material misrepresentations.  <u>Smith v. Fireman's Fund Ins. Co.</u>, 16 F.3d 1221 (Table), 1994 WL 6043, at *2-4 (6th Cir. Jan 7, 1994).

plaintiff's home was broken into and items stolen, including a VCR, Baker reported the loss to

defendant. (Id.) He advised the defendant's adjuster that he had paid for the VCR with cash.

(Id.) Evidence showed, however, that the plaintiff's roommate had purchased and financed

the VCR, and then gave it to the plaintiff as a gift. (Id. at 441-42.) The Baker court did not

find the plaintiff's misrepresentation—as to how he acquired the VCR—material, because the

VCR actually existed and was insured property under the policy. In fact, the roommate's

record of purchase and testimony that he gifted the VCR to the plaintiff verified the existence

of the VCR. (Id. at 442-43.) In contrast, here there is little evidentiary assurance that the

items listed on the falsified documents existed. Specifically, Defendants' supplemental

evidence—affidavits, photographs, and the list of equipment in Hanover's possession—fail to

prove the existence of each piece of equipment listed in the falsified documents Hanover

received. This evidence, at most, proves the existence of approximately 260 items of the

approximately 760 items listed in the falsified documents. (See ECF Nos. 1-6, 1-7, 1-8, 36-1,

37-2, 61-16, 64-1, 65-2, 70-3, 71-1.) [4]

In the instant case, the Court finds that a reasonable person would have attached

importance to the validity of the documents Hanover received in determining whether the

equipment existed. As determined in Baker, a valid receipt and/or bank transaction serves as

evidentiary support that the buyer purchased and possessed the item; that is, the item existed.

Cf. 646 S.W.2d at 442. A reasonable person would find that a falsified receipt and bank

---

[4] The Court counted the items listed in the invoices attached to the original Complaint, the admittedly
falsified documents, and submitted to Hanover. The Court counted 243 items listed in the New York Liquidation
Bureau document (ECF No. 1-6 at PageIDs 27-28); 149 items listed in the Canada Liquidation Sales document
(ECF No. 1-7 at PageIDs 33-36); and 372 items listed in the State of Oregon document. (ECF No. 1-8 at
PageIDs 37-43.) In summation, the lists itemize 764 pieces of equipment.
    The Court calculated the existence of the approximate 260 pieces of equipment by adding the items
listed in Table 1 (reparable items), Table 2 (items not worth restoring), and Table 3 (undamaged items). (ECF
No. 61-16 at PageIDs 1341-42, 1354-61.)

transaction, on the other hand, prove neither purchase nor possession and thus cannot prove existence. Additionally, a reasonable person would find that the supplemental evidence provided here does not prove the existence of each of approximately 760 pieces of equipment listed in the falsified documents Hanover received. (See ECF Nos. 1-6-1-8.) For these reasons, the Court finds that the falsified documents Hanover received, and reasonably relied on, misrepresented a material fact: whether the equipment as represented existed.

Having found the elements of fraudulent misrepresentation satisfied, the Court concludes that Hanover is likely to succeed on the merits on its restitution claim to recover benefit payments made due to Defendants' fraud.[5]

### ii. Rescission Based on Material Misrepresentations

Hanover also argues it is likely to succeed on the merits for its claim that Defendants' post-loss misrepresentations rescind the Policy between the parties. (ECF No. 61 at PageIDs 962-72.) Defendants contend the Policy is not void because the misrepresentations were immaterial. (ECF No. 65 at PageID 1681.)

In Tennessee, voiding or rescinding an insurance policy after a loss occurs is "in the nature of a penalty or forfeiture" and in such a case, "a strict construction should be adopted, and the forfeiture not be enforced except on the plainest grounds, if at all." Boston Marine Ins. Co. v. Scales, 101 Tenn. 628, 49 S.W. 743 (Tenn. Sup. Ct. 1899). Tennessee courts hold that if evidence establishes, on the plainest grounds, that material misrepresentations made in a proof of loss statement were willfully and knowingly made with the intent to deceive or

---

[5] Although the Court finds that Hanover is likely to succeed on its restitution claim, it does not conclude, at this time, that Hanover may recover the entire benefit. Exactly how much Defendants owe Hanover may hinge on a factual determination of the insured items that actually existed prior to the fire.

defraud the insurer, those misrepresentations void the insurance policy.  See Trice v. Commercial Union Assurances Co., Ltd., 334 F.2d 673, 676 (6th Cir.1964); Nix v. Sentry Ins., 666 S.W.2d 462, 464 (Tenn. Ct. App.1983).  Put another way, "when an insurer raises the defense of fraud in connection with a claim made subsequent to the issuance of a policy, in order to void the policy, the insured's false statements must be willfully false in some material matter and made with the intent to deceive the insurer." Sexton v. State Farm Fire & Cas. Co., No. 3:09-CV-535, 2011 WL 1748606, at *3 (E.D. Tenn. May 5, 2011) (citing Joyner v. Omaha Prop. & Cas. Ins. Co., No. 02A01–9301–CV–00021, 1993 WL 295049, at *5 (Tenn. Ct. App. W.S. Aug. 4, 1993); Baker v. Nationwide Mut. Ins. Co., 646 S.W.2d 440, 443 (Tenn. Ct. App.1982)).

For the same reasons Hanover is likely to succeed on its restitution claim, the Court finds Hanover is likely to succeed on its rescission claim.  Brown admitted that he submitted falsified documents to Hanover in an effort to substantiate a claim.  As set out above, the Court finds that these falsified documents misrepresent a material fact: whether all the items listed in the falsified documents existed.  Of the approximately 760 equipment items listed in the falsified documents, supplemental evidence suggests that approximately 260 items existed prior to the fire.  To date, Defendants have not accounted for nearly 500 items listed in the falsified documents.  For these reasons, the Court finds Hanover is likely to succeed on its rescission claim.

Thus, for the reasons stated above, the Court finds that Hanover is likely to succeed on the merits under its restitution and rescission claims.  Accordingly, the Court finds this factor weighs in favor of granting injunctive relief for Hanover.

## 2. Irreparable Harm

As a threshold matter, Defendants contend that this Court may not freeze Defendant Brown's assets through a preliminary injunction because Hanover seeks monetary damages. In support of this proposition, Defendants cite the Supreme Court's decision in Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., which held that "[a] Court may not attach assets through a preliminary injunction where a plaintiff seeks monetary damages." (ECF No. 65 at PageID 1688 (citing Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 144 L. Ed. 2d 319, 119 S. Ct. 1961 (1999)).)

In Grupo Mexicano, the Supreme Court held that "the District Court had no authority to issue a preliminary injunction preventing petitioner from disposing of their assets pending adjudication of respondents' contract claim for money damages." 527 U.S. at 333. The Court reasoned that, because such relief was traditionally unavailable in courts of equity, it remains unavailable—and, consequently, beyond the Court's power—today. Id. The Court was careful to note, however, that the plaintiff in Grupo Mexicano was seeking only money damages and asserted no "equitable interest or lien" in the defendant's property. Id.

This caveat distinguishes Grupo Mexicano from Deckert v. Independence Shares Corp., 311 U.S. 282 (1940). In Deckert, the "principal objects" of the suit were rescission of the contract and restitution for the consideration paid (both equitable remedies), and the Court granted a preliminary injunction freezing the defendant's assets. Id. at 289. The Court stated in Deckert "[t]hat a suit to rescind a contract induced by fraud and to recover the consideration paid may be maintained in equity, at least where there are circumstances making the legal remedy inadequate, is well established." Id.

The Court finds that because Hanover seeks rescission of the policy and restitution of the initial partial payments, Hanover's interests may be maintained in equity, especially where the present circumstances—admitted misrepresentations, untraceable dealings, questionable existence of insured property, and Defendants' limited assets—make a legal remedy inadequate. The Court therefore finds that, in this case, it has authority to prevent Defendant Brown from selling or otherwise encumbering his $1.2 million home.

The Court next turns to whether Hanover will suffer irreparable harm without the requested preliminary injunction. Hanover asserts it will suffer irreparable harm because it is unlikely that Defendants will have adequate funds to pay Hanover damages when the Court resolves this case. (ECF No. 61 at PageID 972.) Although irreparable harm is not typically found where monetary damages are sought, Hanover contends that in specific cases where there is a high likelihood that money would be unavailable to pay the damages suffered by the moving party, there is irreparable harm. (ECF No. 61 at PageID 972 (citing Vireo Sys., Inc. v. HTG Ventures, LLC, No. 3:14-CV-2359, Doc. No. 182 (M.D. Tenn. Feb. 17, 2016); AIG Aviation, Inc. v. Boorom Aircraft, Inc., 142 F.3d 431, at *2 (6th Cir. 1998)).) Hanover specifically contends that based on Defendant Brown's disclosure of his and TME's funds, it appears that together they have less than $2 million in assets compared to the $2.3 million claimed against them, and thus Hanover will suffer irreparable harm if the Defendants are not enjoined from encumbering certain assets, and spending, disposing of, or dissipating the monies fraudulently obtained from Hanover. (Id. at PageIDs 973-74.)

Generally, "[a] plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." Overstreet v. Lexington-Fayette Urban Cty. Gov't, 305 F.3d 566, 578 (6th Cir. 2002) (citing Basicomputer Corp. v.

Scott, 973 F.2d 507, 511 (6th Cir.1992)).  In other words, "monetary damages do not

generally constitute irreparable harm."  Manakee Professional Medical Transfer Serv. v.

Shalala, 71 F.3d 674, 581 (6th Cir. 1995).  But there may be exceptions.  As Deckert holds,

some claims may be maintained in equity where well-established circumstances make the

legal remedy inadequate.  311 U.S. at 289.  For example, in AIG Aviation, Inc. v. Boorom

Aircraft, Inc., the Sixth Circuit Court of Appeals affirmed a district court's grant of a TRO

and injunction where the plaintiff only sought monetary damages.  142 F.3d 431, 1998 WL

69013 (6th Cir. 1998).[6]  When reviewing the district court's analysis, the Sixth Circuit in AIG

Aviation specifically noted that the district court's finding of irreparable harm where "there

was a risk that [defendant] would dispose of all of the money that [plaintiff] sought to have

placed in a constructive trust [and that] once [defendant] spent all the allegedly ill-gotten

money, there would be no money left to vindicate [plaintiff]'s claims," was "certainly not [an]

abuse of its discretion." Id. at *2.  The Sixth Circuit further held that the ultimate purpose of

the TRO—"to allow a victory by [plaintiff] to be meaningful—was sound." Id.

     In the instant case, the Court finds that it is unlikely that Defendants Brown or TME

will have funds available to pay damages when the case resolves.  Hanover asserts that it is

entitled to the entire benefit, $2.3 million, it paid after Defendants submitted the falsified

documents.  The evidence before the Court fails to provide any assurance that either Brown or

TME will have available funds at the resolution of this case, allowing a victory for Hanover

that is meaningful.  Brown testified that he did not know the current amount of money in his

---

[6] The Court notes that this case is an unpublished opinion.  The Sixth Circuit Court of Appeals gives no precedential value to its unpublished opinions, but may regard the reasoning in such opinions instructive. Chevalier v. Estate of Barnhart, 803 F.3d 789, 796 (6th Cir. 2015) (citing Crump v. Lafler, 657 F.3d 393, 405 (6th Cir. 2011) ("Unpublished decisions in the Sixth Circuit are, of course, not binding precedent . . . but their reasoning may be instructive or helpful.").  In the instant case, the Court views AIG Aviation as instructive on what well-established circumstances render a legal remedy inadequate, and whether potentially unavailable funds constitute an irreparable harm.

bank accounts.  (ECF No. 61-1 at PageID 1025:20-25, PageID 1026:1-8, PageID 1045:18-25.)

Brown also testified that prior to the fire he would have large amounts of cash on his person.

(Id. at PageID 1006:4-25, PageID 1039:9-15)  Following the fire, Brown testified he could no

longer afford to carry cash on his person.  (See id. at PageID 1045:10-18.)  Brown further

testified that he owns a $1.2 million home (where he lives), a $100,000 Rolls Royce, and an

empty house in Cordova with mortgage of approximately $250,000.00.  (PageIDs 1028:24-25,

1026:9-25, 1029:6-7 & 23-25.)  Brown admitted that his last known, maximum credit limit on

his existing credit cards was $4,500.00.  (Id. at PageIDs 1030:17-25, 1031:1-18.)  Defendants

Brown and TME's other assets and tax filings are unknown.  (See id. at PageIDs 987:22-25,

988:1-7; 1044:10-25, 1046:13-18.)

The above facts fail to demonstrate that either Defendants Brown or TME is likely to

have sufficient assets to pay damages at the resolution of this case.  Thus, the Court finds that

Hanover's restitution and rescission claims require an equitable remedy so that Hanover may

have a meaningful victory.  Without this relief, the Court finds Hanover would suffer

irreparable harm.  The Court therefore finds this factor weighs in favor of granting Hanover's

injunctive relief.

### 3.    Substantial Harm to Others

Hanover initially requested "injunctive relief seek[ing] to restrain the defendants from

further alienating the funds obtained from Hanover. . . ."  (ECF No. 61 at PageID 974.)  At the

January 6, 2017 motion hearing, however, Hanover amended and limited its requested relief,

seeking only to extend the Court's December 7, 2016 Order—restricting the encumbrance or

sale of Defendant Brown's $1.2 million home—until the Court resolves the case.  At the

hearing, Defendant Brown's counsel indicated that, although Brown currently lives in the $1.2 million house, he wishes to sell it.

At this time, the Court finds that restricting Brown's sale or encumbrance of the $1.2 million home in which he currently resides pending the resolution of this case, will not cause him substantial harm. At most, Brown may be inconvenienced with continued up-keep of the house, a cost Brown would have incurred in any event until the house sold. The Court does not find that such up-keep amounts to substantial harm. Thus, the Court finds this factor weighs in favor of granting Hanover's injunctive relief.

### 4. Public Interest

Hanover asserts that "[t]he public interest is promoted if the defendants are prevented from depleting the monies that the defendants fraudulently obtained from Hanover." (ECF No. 61 at PageID 975.) Defendants counter that public interest favors denying injunctive relief because it sets "a horrific precedent" that "if you are an insured to whom your insurance company makes partial payments, which payments are undisputedly not based on any wrongful acts committed by you, you nevertheless must not spend the proceeds until the insurance company says it is okay." (ECF No. 65 at PageID 1690.) The Court agrees with Hanover and finds that Defendants misconstrue the facts.

The Court first addresses Defendants' statement that Hanover made its initial payments to Defendants before receiving the admittedly falsified documentation. The evidence is to the contrary. Hanover has provided both affidavits and electronic mail that either directly state and/or strongly suggest it received the falsified documents and sworn proof of loss prior to evaluating the Defendants' claims and prior to making its initial partial

payments to Defendants in February and March of 2016.  (See ECF No. 72-1 at PageID 2318

("On December 31, 2015, [Hanover's Executive General Adjuster Gary A. Barkman] received

initial sworn proofs of loss under oath by each of the defendants dated December 30,

2015. . . . I made initial advance payments to defendants on February 24, 2016. . . ."); ECF

No. 61-13 at PageIDs 1303-04 (Keith Hayman, on behalf of defendants, emailed Gary

Barkman on December 14, 2015 stating, "Enclosed please find invoices for some original

studio purchases.  Some of these may have been previously provided. . . . The Insured has

provided ample documentation, information, statements, executed consent forms, etc…to

facilitate the initial partial payments.  Information will continue to be provided, as

requested.").)

Having found that Hanover made its initial payments after receiving the falsified

documents, the Court finds that the public interest supports enjoining Defendants from

depleting funds secured by fraudulent misrepresentations.  The Court therefore finds that

preventing Brown from selling or encumbering his $1.2 million home pending the resolution

of this case is supported by public interest.

In sum, the Court finds that each of the preliminary injunction factors supports the

requested injunctive relief.  Accordingly, the Court turns to the issue of security bond.

### B.      Security Bond

As stated above, "[t]he Court may issue a preliminary injunction or a temporary

restraining order only if the movant gives security in an amount that the court considers

proper to pay the costs and damages sustained by any party found to have been wrongfully

enjoined or restrained."  Fed. R. Civ. P. 65(c).  The amount of an injunction bond is within the

sound discretion of the district court.  <u>Aluminum Workers Int'l Union, AFL-CIO, Local Union No. 215 v. Consol. Aluminum Corp.</u>, 696 F.2d 437, 446 (6th Cir. 1982).

At the January 6, 2017 motion hearing, the parties opined as to the appropriate security bond for the requested injunctive relief.  Defendants requested a bond between $800,000.00 and $1.2 million, whereas Hanover requested a $120,000.00 bond.

The Court determines that a $400,000.00 security bond is appropriate in this case. The Court finds that, in light of evidence that approximately 260 pieces of equipment existed at the time of the fire, a $400,000.00 security bond is proper to pay the costs and damages sustained by Brown, if he is found to have been wrongfully enjoined or restrained.

## IV.    CONCLUSION

For the reasons stated above, the Court GRANTS Hanover's Motion for Preliminary Injunction.  Defendant Brown is hereby ENJOINED from selling or otherwise encumbering his $1.2 million home until resolution of this case or with leave of the Court.   Hanover shall post a $400,000.00 security bond.  Upon the posting of the bond, this injunction shall be RECORDED as to the applicable property located at 1668 Pisgah Road, Cordova, Tennessee (ECF No. 61 at PageID 973) with the Shelby County Register of Deeds.

**IT IS SO ORDERED**, this 24th day of January, 2017.

 /s/ Jon P. McCalla
JON P. McCALLA
 UNITED STATES DISTRICT COURT JUDGE